**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MEREDITH OPERATIONS CORPORATION, | CIVIL ACTION NO. _____ |
| *Plaintiff*, | |
| v. | **COMPLAINT** |
| MARQUEE BRANDS INTERMEDIATE HOLDINGS II LLC and MARTHA STEWART LIVING OMNIMEDIA, LP, | JURY TRIAL DEMANDED |
| *Defendants*. | |

Plaintiff Meredith Operations Corporation ("Meredith"), by its attorneys Quinn Emanuel Urquhart & Sullivan, LLP, brings this action for a declaratory judgment against Defendants Marquee Brands Intermediate Holdings II LLC ("Marquee") and Martha Stewart Living Omnimedia, LP ("MSO," and together with Marquee, the "Licensors"), and respectfully alleges as follows:

## INTRODUCTION

1.      This is a straightforward declaratory judgment case asking the Court to reject a sham notice of breach and hold sophisticated parties to their decade-old bargain.

2.      Plaintiff Meredith was founded 123 years ago in Des Moines, Iowa, to publish *Successful Farming* magazine.  Today, it is part of Dotdash Meredith Inc. ("DDM"), the result of a 2021 transaction that brought the deep digital-first expertise of Dotdash, a leading internet publisher, to Meredith's iconic magazine portfolio.  DDM is America's largest print and digital publisher with over 40 renowned brands—including *Better Homes & Gardens*, *People*, *Parents*, *Food & Wine*, *Entertainment Weekly*, and *Travel + Leisure*—and attracts about 200 million visitors to its digital properties each month.

3.      Meredith (and now DDM) have long been recognized for their exceptional track records of publishing quality content and building beloved brands that consumers trust.

4.      So it is no surprise that a decade ago, the Defendant Licensors turned to Meredith to take over digital and print publishing for their *Martha Stewart* brand.

5.      The Licensors received the right to an annual royalty fee triggered off of advertising revenue, among other things.  In return, Meredith was granted the sole and exclusive worldwide right to produce and publish *Martha Stewart* content, including the broad editorial discretion necessary to do so.

6.      The parties' respective rights and obligations were set forth in detail in a heavily-negotiated agreement, the operative December 21, 2015 Amended and Restated Magazine, Content Creation and Licensing Agreement (the "Agreement").

7.      For nearly ten years, Meredith has done what it was required to do under the Agreement, and more.  And for nearly ten years, the Licensors never suggested otherwise.  Nor could they have.  Under Meredith's stewardship—now with the benefit of DDM's enhanced digital expertise—the brand's flagship platform *MarthaStewart.com* is the number seven ranked "home improvement" website in the entire United States.

8.      But now the Agreement's initial term is about to expire and the Licensors want an unlawful windfall.

9.      Under the Agreement, the initial ten-year term is automatically extended unless one party opts out—in which case, the so-called "Renewing Party" has the right to buy out the "Non-Renewing Party" at an agreed-upon 3.75x operating profits multiple.

10.      Meredith has worked for a decade to build *Martha Stewart* into a best-in-class brand.  It intends to publish more award-winning content and propel the brand to new and greater heights in the years to come.  Meredith wants to renew—and if the Licensors do not, Meredith would exercise its buyout right so it can keep publishing *Martha Stewart* content for its millions of readers.

11.      The Licensors do not want to renew—and yet they do not want to sell to Meredith at the agreed-upon multiple, either.  Instead, they have made clear that they want to buy out Meredith on the cheap, having previously attempted to do so at a woefully inadequate price that Meredith rejected.

12.      And so with the renewal date approaching at year-end, the Licensors have tried to come up with a new way to deny Meredith its buyout right and yet reacquire the publications for

themselves at a discount.  They devised a bad faith scheme to claim that Meredith has materially breached the Agreement—which if true, would give the Licensors a basis to terminate the Agreement and a contractual right to buy back the *Martha Stewart* publishing business at a dramatically below-market 1.5x profits multiple.

13.    But the threshold problem with their scheme is that Meredith has not breached the Agreement.  What the Licensors have presented as their "material breach" is blatantly pretextual. It is also obviously wrong.  They claim that Meredith is failing to "use commercially reasonable efforts to maintain a minimum of ten (10) million average unique monthly visitors on the [*Martha Stewart*] Websites as measured by Google Analytics."

14.    Meredith cannot conceivably have breached this obligation, much less materially so.  The best evidence of that:  In 2024, per Google Analytics, *MarthaStewart.com* averaged 10,047,059 monthly unique visitors.

15.    This is no small feat.  Only a small sliver of all websites in the United States have over 10 million monthly unique visitors.  Oprah's *Oprah Daily* website and Gwyneth Paltrow's *Goop* website both have a fraction of *Martha Stewart's* visitors—Oprah, about a third of Martha's, and Gwyneth, less than ten percent.

16.    Using DDM's market-leading digital expertise, Meredith has achieved these results for *MarthaStewart.com* despite widely-reported headwinds in the digital publishing industry that have made it increasingly difficult to drive website traffic.  That is reflected in publicly-available data showing that the *Martha Stewart* website has performed markedly better than other websites in the same segment.

17.    None of this came easily.  It has been a result of sustained investment in the brand, including—in the past two years alone—a multifold increase in published articles, innovative new

content, and many technical enhancements that have driven user engagement and associated revenues.

18.     Meredith's efforts cannot fairly be questioned.  The claimed breach is made up.  It certainly cannot provide a basis for the Licensors to terminate the Agreement.

19.     Meredith has a deep appreciation for the *Martha Stewart* brand born from a decade-long partnership.  And Meredith especially values its relationship with Martha Stewart herself, whose perspectives on creative everyday living have inspired millions of people worldwide, and whose brand and content continue to inform, delight, and inspire.

20.     Meredith regrets that the Licensors have called Meredith's commitment to *Martha Stewart* into question in service of their own desire for an improper financial windfall, and brings this lawsuit to vindicate its contractual rights and reputation.

## THE PARTIES

21.     Plaintiff Meredith is a corporation organized under the laws of Iowa with its principal place of business in Des Moines, Iowa.  It is the successor to its affiliate Meredith Corporation, the original licensee under the Agreement.  Following a 2021 acquisition by the leading digital publisher Dotdash, Meredith is now an affiliate of DDM, the country's largest print and digital publisher.

22.     Defendant Marquee is a Delaware limited liability company with its principal place of business in New York, New York.  It is owned by investment funds affiliated with Neuberger Berman, the $500 billion asset manager.  Marquee acquired the *Martha Stewart* brand from and is the successor to Sequential Brands Group, Inc. ("SBG"), one of the two original licensor signatories to the Agreement, in April 2019.

23.     Defendant MSO is a limited partnership organized under the laws of Delaware with its principal place of business in New York, New York.  Martha Stewart, the first self-made female

billionaire in the United States, founded MSO in 1997 to consolidate her various business ventures. MSO was previously owned by SBG, and is now owned by an affiliate of Marquee. MSO is the other licensor under the Agreement.

24.     Meredith, Marquee, and MSO are all sophisticated parties that should be held to the terms of the Agreement.

## JURISDICTION AND VENUE

25.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) because there is complete diversity of citizenship among the parties and the amount in controversy exceeds $75,000.

26.     Among other things, Meredith's annual proceeds based on the Agreement exceed $75,000, and as alleged herein, Meredith would be deprived of these proceeds if the Licensors' claimed breach is upheld and they are permitted to terminate the Agreement.

27.     Upon information and belief, each of Marquee's members is not a citizen of Iowa and is a citizen of a state other than Iowa for purposes of diversity jurisdiction. Likewise, each of MSO's general or limited partners is not a citizen of Iowa and is a citizen of a state other than Iowa for purposes of diversity jurisdiction.

28.     This Court has personal jurisdiction over the Licensors because they reside in New York and because the Agreement contains a forum-selection clause providing for "sole and exclusive jurisdiction and venue in the Federal or State courts in the County of New York, New York." Agreement § 25(g).

29.     Venue is proper in this District pursuant to the forum-selection clause in the parties' Agreement and 28 U.S.C. § 1391(b)(1).

## FACTUAL ALLEGATIONS

**A.    MSO Turns To Meredith, A Publishing Market Leader, To Publish The *Martha Stewart* Brand**

30.    Meredith is one of America's most storied publishing companies.  It has been in the business for more than a century.

31.    Meredith Corporation, Meredith's predecessor (and the original signatory to the Agreement), was founded in 1902 by Iowa native Edwin Thomas Meredith, the future U.S. secretary of agriculture under President Woodrow Wilson.  Its first publication was called *Successful Farming*.

32.    In 1922, Meredith began publishing the magazine later named *Better Homes & Gardens*.  Over the ensuing decades, Meredith became the home for widely-read publications in a range of categories, with a portfolio eventually including *Entertainment Weekly*, *Food & Wine*, *Health*, *InStyle*, *Parents*, *People*, *Southern Living*, *Travel + Leisure*, and more.

33.    From 1990 until 2014, *Martha Stewart Living* was a print magazine under the *Martha Stewart* brand, published first by publishing conglomerate Time Inc. and then by MSO. The magazine had a loyal readership, but it was not profitable.  From 2005 to 2013, *Martha Stewart Living* made money only in one year, in 2007.

34.    In 2014, MSO decided to partner with Meredith.  It touted the deal to its investors as a way to "immediately improve [its] bottom line" by leveraging "Meredith's much larger size and sales expertise [to] expand [its] brands' reach."  MSO would "focus entirely on what [it did] best: the creation of inspirational, original, practical, useful, and trusted content."

35.    Thus, under the parties' 2014 licensing agreements (the "Prior Agreements"), Meredith assumed ad sales, circulation, and production of *Martha Stewart Living* in the United States and Canada in print and online, but MSO remained responsible for creating editorial content.

6

36.     Under the Prior Agreements, MSO was remunerated in multiple ways.  Meredith paid MSO a per-page amount for the content it produced, a royalty tied to the magazine's operating profit, and a 50% revenue share in all digital advertising revenue.

37.     But a year later, MSO's priorities had shifted.  In the interim, in April 2015, MSO had been acquired by SBG (Marquee's predecessor), a portfolio company of private equity firm Tengram Capital Partners— a deal that netted MSO over $350 million.

38.     SBG-owned MSO was no longer interested in creating *Martha Stewart* editorial content itself and wanted Meredith to produce the content instead.  So the parties negotiated a revised deal that put Meredith in charge of editorial content in addition to the operations and business of the *Martha Stewart* publishing brand.

**B.     The Parties Enter Into The Agreement**

39.     On December 21, 2015, the parties entered into the Agreement, which expressly "supersede[d] and replace[d]" the 2014 Prior Agreements.  Agreement § 25(l)(i).

40.     In addition to Meredith and MSO, MSO's new owner SBG was made a party to the 2015 Agreement.

41.     The Recitals to the Agreement explain that the Licensors "have requested Meredith perform the editorial content production previously performed by MSO and as a result, the Parties have agreed to modify the economic terms of the Prior Agreement[s]."

42.     The Agreement gives Meredith near-total control over use of the *Martha Stewart* brand in magazine and digital publishing, including websites, apps, and social media.  It provides that "Meredith shall [] have the sole and exclusive right and obligation to host, produce, program,

develop and select the . . . content for, publish, print and distribute . . . the Magazines, Websites, and MSO Interactive Properties in the Territory."  Agreement § 6(a).[1]

43.    Unlike the Prior Agreements, the "Territory" of the license is "worldwide." Agreement § 3.

44.    The Licensors' rights are commensurately limited.  They "have approval over each Magazine cover," "any change to the logo," or "any launch of a new foreign language version," but even those approvals are "not to be unreasonably withheld or delayed."  Agreement §§ 5(a), 6(a)(ii).  And if they wish, the Licensors "have the right to contribute a guest column to each issue of the Magazines," subject in this case to "Meredith's right of approval."  Agreement § 5(b).

45.    Both the Licensors and Meredith also have specific contractual obligations set forth in the Agreement.

46.    The Licensors are required, among other things, to "ensure that . . . Ms. Martha Stewart shall make herself personally available" for "content generation activities."  Agreement § 5(o).  They are also subject to non-competition provisions that broadly prohibit them from using *Martha Stewart*-related content in any non-Meredith publication.  Agreement § 8(a).

47.    Meredith's obligations are principally in Section 6 of the Agreement.  Relevant here, Section 6(g) requires Meredith to

> use commercially reasonable efforts to maintain a minimum of ten (10) million average monthly unique visitors on the Websites as measured by Google Analytics or other mutually agreed-upon similar analytics platform; provided however, that Meredith shall not be responsible for any drop in the number of visitors that result[s] from factors beyond Meredith's control (e.g., changes in Google's algorithms or changes in reporting methodology due to no fault of Meredith).

---

[1]    "Magazines" is defined in the Agreement to refer to the print magazines *Martha Stewart Living* and *Martha Stewart Weddings*, "Websites" to *MarthaStewart.com* and related websites, and "MSO Interactive Properties" to any *Martha Stewart*-related mobile applications or social media accounts (in addition to the Websites).  In essence, the Agreement encompassed the full universe of *Martha Stewart*-branded content published anywhere in the world.

48.     As MSO would no longer be producing content, the Agreement (unlike the Prior Agreements) does not give the Licensors a payment right related to content generation. Nor (unlike the Prior Agreements) does it provide for a royalty payment tied directly to the brand's operating profits. Instead, the Licensors' remuneration under the Agreement is limited to an annual royalty payment tied to net advertising revenues (10%, above a defined "Initial Royalty Threshold"). Agreement § 11(a)(iv). This amount is payable to SBG (now Marquee, as its successor), not MSO. *Id.*

49.     The Agreement's term is ten years with an end date of December 31, 2025. Agreement § 15(a).

50.     However, after this "Initial Term," the Agreement "shall be automatically extended for one (1) year extensions . . . unless a Party notifies the other Parties in writing of its intent not to renew at any point at least sixty (60) days prior to the end of the Initial Term or any Renewal Term." Agreement § 15(a).

51.     If a party elects not to renew, then the other party "shall have the right to purchase the assets of the Magazine Business, Websites, and MSO Interactive Properties from the Non-Renewing Party" at a 3.75x multiple tied to the brand's "Operating Profit" over the prior year. Agreement § 15(l).

52.     The Licensors have the right to terminate the Agreement prior to the end of the ten-year Initial Term only under certain contractually-specified conditions. Those include if Meredith "fails to timely satisfy any of its material non-payment obligations pursuant to this Agreement . . . and such failure is not cured within thirty (30) days after [the Licensors] provide[] Meredith with written notice of such failure." Agreement § 15(b)(ii).

53.     If the Agreement is validly terminated pursuant to this "material breach" provision, the Licensors have the option to buy Meredith out at a lower 1.5x multiple, again tied to the brand's "Operating Profit" over the prior year.  Agreement § 16(a)(ii).

54.     The Agreement cannot be "amended, altered or modified except by a written instrument executed by both Parties."  Agreement § 25(c).

55.     In the event of a dispute between the parties, the Agreement requires the parties to "engage in informal, good faith discussions and attempt to resolve the Dispute during a period of ten (10) Business Days after a Party notifies the other of such Dispute in writing."  Agreement § 24.  If they are unable to do so, then any lawsuit must be filed in a court located "in the County of New York, New York."  Agreement § 25(g).

56.     The Agreement is to be "governed by and construed in accordance with the laws of the State of New York, without regard to its conflicts of laws rules."  Agreement § 25(f).

**C.    Meredith Performs Its Obligations Under The Agreement, Leading To Successful Results For The *Martha Stewart* Brand**

57.     Meredith has always complied with its obligations under the Agreement.  More than that, despite well-documented challenges in the publishing industry, the *Martha Stewart* brand has thrived under Meredith's stewardship.  In recent years, Meredith has successfully applied DDM's market-leading expertise in digital media to adapt to an ever-changing industry and to continue to innovate, implementing Martha Stewart's own motto:  "When you're through changing, you're through."

58.     A decade ago, when the Licensors turned to Meredith to take over the *Martha Stewart* brand, *Martha Stewart Living* had been losing money every year.

10

59.     It was not alone.  As the New York Times reported around that time, the financial outlook for print magazines was "bleak," with double-digit annual declines in print advertising anticipated to continue for the foreseeable future.

60.     This reality was reflected in the parties' Agreement.   The parties expressly anticipated that there might come a day when it was no longer economically tenable to publish *Martha Stewart Living* in print, and negotiated a provision for "discontinuance" of the print edition tied to multiple consecutive years of unprofitability during the Agreement's term.   Agreement § 15(d).  However, the discontinuance would "cease to be of effect" if Marquee paid the prior two years' profit shortfall.  Agreement § 15(d)(i).  Alternatively, Marquee could step in and acquire the magazine itself.  Agreement § 15(d)(ii).

61.     At the same time, Meredith saw potential in the growth of the *Martha Stewart* brand's digital assets, including its flagship *MarthaStewart.com* website.  In announcing the parties' deal, MSO specifically called out Meredith's "expertise and scale" in the "digital fields."

62.     Meredith put its expertise to work for the Licensors' publications, both in print and online, creating content whose excellence has been recognized in the industry.  In 2016, leading industry publication *Digiday* noted that a single Meredith-produced Martha video had received over a million views.  In 2017, the print magazine *Martha Stewart Living* was named one of *Ad Age*'s magazines of the year.  In 2020, another video on *MarthaStewart.com* was an honoree for a Webby award in the food and drink category.

63.     In March 2021, after multiple years of continued unprofitability, Meredith made the difficult decision to discontinue publishing the print edition of *Martha Stewart Living*.  This gave rise to Marquee's right to either cure the profit shortfall or acquire the magazine, but it declined to do either, and the last print edition was published in May 2022.

64.    Around the same time, Dotdash acquired Meredith.  It was widely reported as a "peanut-butter-and-chocolate" transaction, with Meredith's devoted nationwide readership and already "record digital growth" joining forces with Dotdash's industry-leading "digital know-how."  As a result of the deal, *Martha Stewart* stood to benefit from DDM's digital expertise, and Meredith only amplified its efforts to expand and improve upon *Martha Stewart*'s digital platforms, including *MarthaStewart.com* and its social media accounts.

65.    Like print publishing, most of the economics of digital publishing is driven by ad revenue, and ad revenue depends on views.  Meredith (as part of DDM) is at the vanguard of digital publishing strategies that drive views, user engagement, and advertising revenue.  Today, to give just one example, Meredith uses a proprietary intent-based ad-targeting approach that analyzes billions of consumer interactions and content signals to understand consumers' intent as they explore *MarthaStewart.com* in order to deliver better-performing advertisements without relying on cookies or other personal identifiers.  Meredith has also developed innovative approaches to try to ensure favorable placement of *Martha Stewart* content in search engine results.

66.    Since the beginning of 2023, Meredith increased its output of new published articles on *MarthaStewart.com* from 88 articles per month to 233 per month, a 165% increase, and updated articles from 108 per month to 173 per month, a 60% increase.  Since 2022, Meredith has added about 1,400 new, original images to *MarthaStewart.com*.  In April 2024, Meredith launched a new Daily Recipe email.  In November 2024, Meredith inaugurated a new email newsletter called The Martha Memo to better promote trending new content.  All of these efforts have driven substantial new website traffic.

67.    Meredith has also made a host of website enhancements to grow traffic and maximize user engagement.  In March 2023, it re-platformed *MarthaStewart.com* to DDM's

proprietary state-of-the-art "tech stack," which increased site speed and performance.  In 2024, it made several enhancements to the website's recipe pages to increase engagement, including adding a "Jump to Recipe" button that allows a user to skip over introductory content, a "Cook Mode" that prevents a screen from turning off due to inactivity, and new review features.  In August 2024, a "continuous scroll" was added to the website that automatically loads new content rather than requiring readers to click to navigate new content, which substantially increased readers' "page views" on the website.  Just two months ago, in January 2025, Meredith added a dynamic news feed populated with new content published in real time to the top of the *MarthaStewart.com* homepage, a feature with strong search engine optimization benefits.[2]

68.    Meredith's efforts have been successful.

69.    Today, per leading web analytics company Similarweb, *MarthaStewart.com* is the seventh-ranked "home improvement" website in the United States.  *Variety*, *Rolling Stone*, *Wired*, and the White House website all attract fewer visitors.  Martha's website attracts more traffic than Oprah's and Gwyneth Paltrow's by many multiples.[3]  In the home improvement, food and beverage, and lifestyle categories, *MarthaStewart.com* does better than *Bon Appetit*, *Epicurious*, *House Beautiful*, and *Country Living*.  Among other brands owned by Meredith and its affiliates,

---

[2]    Setting aside its digital efforts, in the past year alone, Meredith published four special interest print magazine issues:  *Martha Stewart Gardening* in March 2024, *Martha Stewart Halloween* in August 2024, *Martha Stewart Holidays* in October 2024, and *Martha Stewart Organizing* in December 2024.  Meredith was under no obligation to print these magazine issues, *see* Agreement, Schedule F, and yet did so at the Licensors' request.  Meredith also shared revenue from the special interest publications on terms that were more favorable to the Licensors than the Agreement provides.  And Meredith agreed to produce four additional special interest issues on similar terms in 2025.

[3]    Other celebrity lifestyle websites have shut down entirely, including Blake Lively's *Preserve.us* and the blog portions of *LaurenConrad.com* and Reese Witherspoon's *DraperJames.com*.

again per Similarweb, *MarthaStewart.com* has traffic roughly equal to two of Meredith's other leading publications, *Better Homes & Gardens* and *Food & Wine*.

70.     The strong performance of *MarthaStewart.com* is all the more notable when considered in the context of the severe headwinds that have been facing the digital publishing industry.

71.     In recent years, web traffic to digital publishers has dried up because of changes to the algorithms of the major sources of referrals. For example, Facebook referrals to top publishing sites fell approximately 62% from August 2022 to August 2023 alone. From a longer-term perspective, Facebook referrals in 2024 were less than a quarter of what they were in 2018. The growth of "AI Overviews" on Google has also reduced referral traffic by increasing the number of "zero-click" searches where search queries on Google's platform do not lead to user clicks on any third-party websites. Such searches accounted for almost 60% of all Google searches as of mid-2024. These trends persist to the present day and have caused many digital publishers to hemorrhage viewers and even shutter.

72.     Meredith has always been transparent with the Licensors about these challenges and has proactively communicated Meredith's efforts to overcome them. As early as March 2018—seven years ago—Meredith presented the Licensors with a "Digital Update" that explained that declines in referrals from social media were offsetting gains in web traffic from so-called "organic" searches in which a user seeks out content on a search engine. The forty-page presentation went on to analyze in detail which editorial content had been most successful in driving views and laid out a plan for maintaining web traffic to *MarthaStewart.com*.

73.     Since then, Meredith has regularly provided the Licensors with similar information showing Meredith's commercially reasonable efforts to drive web traffic in spite of the sustained

downward movement in the industry—trends far outside the control of Meredith.  The Licensors are fully aware of Meredith's significant and ongoing efforts to keep and grow more *MarthaStewart.com* readers.

74.    The Licensors are also aware that because of Meredith's efforts, web traffic to *MarthaStewart.com* has remained at essentially the same levels since 2017.  In fact, web traffic to *MarthaStewart.com* actually grew in 2024 relative to 2023.  These results substantially outperform *Martha Stewart*'s peer brands.

75.    To give just one other comparison, of the twelve other brands in Meredith's "Home & Pets" portfolio, only two grew traffic in 2024.

76.    At the same time, *Martha Stewart*'s social media accounts have grown dramatically on account of Meredith's efforts.  Meredith increased social media video production from 2023 to 2024, posting 29% more on Instagram and 49% more on TikTok.  And in just the past two years, *Martha Stewart*'s Instagram followers grew from 4 million in 2023 to 5.5 million in 2025, a 37% increase.  TikTok followers grew from 70,000 to 533,000, a 661% increase.  In each case these increases are substantially greater than *Martha Stewart*'s peer brands, including other Meredith brands in the same portfolio.

77.    The success of any lifestyle website is far from guaranteed—even one associated with someone as well-known as Martha Stewart.  Indeed, since mid-2021, Martha Stewart has been operating another website, *Martha.com*, apart from her Agreement with Meredith.  Meredith is not involved with *Martha.com*, although Meredith has permitted links to content on *Martha.com* on *MarthaStewart.com*, which Meredith is not obligated to do.

78.    Even so, by contrast to *MarthaStewart.com*, which attracts over ten million monthly unique visitors, *Martha.com* only attracts tens of *thousands* of monthly unique visitors.

D.    **The Licensors Concoct A Pretextual And Baseless Notice Of Breach**

79.    Over the more than ten years since the inception of the parties' contractual relationship, the Licensors never suggested that Meredith was failing to live up to its contractual obligations.[4]

80.    Given Meredith's efforts involving the *Martha Stewart* brand, and the results that followed from them, there has never been a basis for the Licensors to complain.

81.    But now that the ten-year Initial Term of the Agreement is coming to an end, the Licensors are trying to exploit the early termination provision of the Agreement to secure a financial windfall.

82.    Their motive is rooted in the interplay between the renewal and termination provisions described above.

83.    The Agreement will automatically renew on December 31, 2025 unless either Meredith or the Licensors chooses not to renew at least sixty days prior.

84.    The Licensors do not want to renew.  In recent years, net advertising revenues have not been high enough to surpass the contractual threshold and entitle the Licensors to an annual royalty payment.  This is a matter of never-disputed contractual math that was foreseeable at the time the Agreement was signed.

---

[4]    It bears noting that the inverse is not true.  The Licensors have routinely failed to comply with their own obligations under the Agreement, and Meredith has told them so.  These include repeated breaches of the Licensors' non-competition obligations, Agreement § 8; breaches of their obligation to make Martha Stewart available for content generation activities requested by Meredith, Agreement § 5(o); and repeated and commercially disruptive infringements by MSO and its principals of Meredith's bedrock "sole and exclusive" right to exercise its editorial discretion over the *Martha Stewart* brand, Agreement §§ 2, 6(a).  The Licensors' spurious notice of breach is particularly hypocritical in light of the forbearance with which Meredith has approached the Licensors' own misconduct over the years.

16

85.    But the Licensors also know that if they opt out of renewal, Meredith will have the right to purchase the *Martha Stewart* brand assets at the contractually agreed-upon 3.5x multiple. The Licensors want to deprive Meredith of that right.

86.    The only way to do so is to claim material breach and terminate the Agreement early, which could allow the Licensors to buy back the *Martha Stewart* publishing business at a below-market 1.5x multiple.

87.    This is the pretextual reason why the Licensors concocted a breach notice.  It also explains why the claimed material breach is so obviously baseless.  They had to come up with something from nothing.

88.    According to the Licensors' breach notice, which they sent to Meredith on February 21, 2025, Meredith had breached Section 6(g) of the Agreement by failing "to use commercially reasonable efforts to maintain a minimum of ten (10) million average monthly unique visitors on the Websites as measured by the mutually agreed-upon analytics platform, com[S]core."  Revealing the true purpose behind the notice, the Licensors warned that "failure to cure the Default within thirty (30) days . . . may result in termination of the Agreement."

89.    The notice was defective in many ways.  But start with how it ignores the language of the parties' Agreement.  Contrary to the breach notice, Section 6(g) does not refer to "comScore" as the parties agreed-upon analytics platform—it specifically says that monthly unique visitors shall be "measured by Google Analytics."

90.    This was an intentional choice.  Multiple other provisions of the Agreement refer to "comScore."  *See* Agreement §§ 5(e), 6(p).  But Section 6(g) does not.  It refers specifically to "Google Analytics."

91.    Measured by Google Analytics, as the Licensors well know, they cannot conceivably claim breach.  In 2024, despite all of the challenges facing digital publishers like Meredith, *MarthaStewart.com* exceeded 10 million average monthly unique visitors.

| Month | Google Analytics Total Users |
|-------|------------------------------|
| Jan-2024 | 9,282,643 |
| Feb-2024 | 8,674,782 |
| Mar-2024 | 9,563,605 |
| Apr-2024 | 9,627,927 |
| May-2024 | 13,841,572 |
| Jun-2024 | 10,615,226 |
| Jul-2024 | 11,036,530 |
| Aug-2024 | 10,875,072 |
| Sep-2024 | 7,925,982 |
| Oct-2024 | 8,112,927 |
| Nov-2024 | 10,556,539 |
| Dec-2024 | 10,451,899 |
| **Avg 2024** | **10,047,059** |

92.    On top of that, the Licensors' breach notice ignores that a failure to meet the 10 million visitor benchmark does not necessarily constitute a breach.  Per Section 6(g), Meredith's obligation is to "use commercially reasonable efforts" to maintain 10 million visitors on average, and Meredith expressly "shall not be responsible for any drop in the number of visitors that result[s] from factors beyond Meredith's control."

93.    Since Meredith *did* meet the 10 million visitor benchmark, this is purely academic, but the Licensors made no attempt to show that Meredith's efforts to drive traffic to *MarthaStewart.com* fell short of commercially reasonable, or that any imagined shortfall was due to a lack of effort on the part of Meredith rather than the well-documented industry factors described above that are outside of Meredith's control.

94.    Meredith responded to the Licensors' notice on February 28, 2015, rejecting the claimed breach.  Meredith attached an exhibit proving that Meredith has done exactly what the

18

Agreement requires: "delivered over ten million average monthly unique visitors to marthastewart.com as measured by Google Analytics[]." As Meredith explained, "[t]his is and always has been the metric covering Section 6(g) of the Agreement, and there is no breach for Meredith to cure." Meredith concluded by calling the breach letter out for what it was: "pretext attempting to improperly terminate an Agreement that the [the Licensors] apparently no longer value."

95.     The Licensors replied on March 5, 2025. They did not deny that the notice of breach was pretext for an improper termination. They did not deny that as measured by Google Analytics, the contractually agreed-upon platform, Meredith exceeded the 10 million visitor benchmark in Section 6(g). They again failed to identify any lack of effort on Meredith's part that accounted for any perceived shortfall in visitors. But they continued to insist that visitors should be measured by comScore, not Google Analytics, and that measured by comScore, Meredith fell short of the 10 million user benchmark. According to the Licensors, Section 6(g) allowed website visitors to be "measured by Google Analytics or [an]other mutually agreed-upon similar analytics platform," and the parties had somehow—unbeknownst to Meredith—agreed to replace Google Analytics with comScore for purposes of Section 6(g).

96.     The Licensors' position is factually untrue, legally baseless, and commercially absurd.

97.     For one thing, the comScore data that the Licensors pointed to as evidencing breach is not "similar" to Google Analytics. The Agreement's "Territory"—and *MarthaStewart.com*'s readership—is "worldwide." This made Google Analytics' Total Users metric, which measures unique visitors globally, the logical contractual choice. The comScore data that the Licensors pointed to, by contrast, is limited exclusively to visitors from the United States. It is completely

ill-fitted to Section 6(g). Meredith never would have—and did not—agree to a metric that would drastically and illogically undercount web traffic.

98. In any case, Meredith certainly did not "mutually agree[]" to replace the logical and agreed-upon contractual metric, Google Analytics, with comScore.

99. In its March 5 letter, the Licensors referred to an email exchange from earlier this year between Marquee and Meredith executives. In hindsight, it is apparent what this email exchange was: a clumsy attempt to trick Meredith into a breach. Setting aside the exceptional bad faith of a party trying to entrap its longtime contractual counterparty by email, the attempt was an abject failure—Meredith expressly rejected the Licensors' request to replace Google Analytics with comScore for the purposes of its obligations under Section 6(g) of the Agreement.

100. Here is what happened. Back on January 28, 2025, a Marquee executive reached out to his counterpart at Meredith to ask for Google Analytics numbers to "update the detail on some of [its] financial reporting."

101. The Meredith executive responded with the data within the week. She provided data from both Google Analytics and comScore. She explained that "Google Analytics is the most accurate way to track a site," but acknowledged that comScore is what the "[i]ndustry uses" while also flagging "quite a few issues and discrepancies with com[S]core over the last year."

102. Needless to say, these factual comparisons between Google Analytics and comScore did not constitute either an offer or an acceptance to replace one with the other for purposes of measuring Meredith's compliance with its obligations under Section 6(g), which does not refer to what the "industry uses" but instead names Google Analytics specifically.

103.    In a follow-on exchange, the Meredith executive also clarified that Google Analytics does not have a metric called "Unique Visitors," but that its "Total Users" metric tracks unique visitors.  Indeed, Google Analytics' own website makes this clear:

| Metric | What it is |
| --- | --- |
| Total users | The number of unique users who triggered any event in the specified date range. An event is triggered when the criteria for an event is met. For example, an event trigger can be set so that if someone makes a purchase, the text 'purchase' populates the dimension. |

104.    This was the parties' email exchange.  It did not reference Section 6(g) or the parties' Agreement.  Neither side proposed, much less accepted, an amendment to Section 6(g).  Meredith did not even say that comScore was better or more accurate than Google Analytics—in fact, it said the opposite.

105.    Plus, recall that the Agreement cannot be amended "except by a written instrument executed by both Parties."  Agreement § 25(c).  This email exchange was not "executed" by anyone.

106.    Nevertheless, ten days later, the Licensors unilaterally asserted that the parties had "jointly agreed via email . . . that comScore is the industry standard for analytics" and that since the comScore numbers were below 10 million monthly visitors, a formal breach notice would follow.

107.    Of course, even if the referenced email exchange truly constituted a "joint[] agree[ment]" that comScore was the "industry standard" (which it did not), and even if was executed by both parties (which it was not), that would not mean that it was the new agreed-upon analytics platform for purposes of Section 6(g) of the Agreement.  The parties were free to select

any analytics platform, industry standard or not—and they chose Google Analytics, not comScore. It bears repeating that this choice made sense: a worldwide license should not be tracking unique visitors solely in the United States, as the comScore data did.

108.    Meredith put to rest any doubt about what it had agreed to do in its response:

Our email exchange regarding Comscore and [Google Analytics] in early February did not constitute a mutual agreement to change the contract metric from [Google Analytics] Total Visitors to Comscore. First, the original 10M target was based on [Google Analytics'] measurement of average monthly total visitors. It is not commercially reasonable to compare this [Google Analytics] number to Comscore and interchange the target, as each measures users/visitors differently. Current [Google Analytics] numbers show that average monthly total visitors to marthastewart.com exceeded 10M in 2024. Second, regardless of the metric used, [Meredith] has at all times used commercially reasonable efforts to maintain our traffic targets and thus has no violation to cure.

109.    The Licensors sent their pretextual notice of breach anyway on the same day.

110.    After receiving the notice of breach, in addition to the exchange of correspondence referenced above, Meredith engaged in good faith discussions with the Licensors in an attempt to resolve the dispute. Those discussions were not successful and the Licensors have maintained their sham notice of breach.

111.    This lawsuit follows.

## **CAUSE OF ACTION (DECLARATORY JUDGMENT)**

112.    Meredith incorporates the preceding paragraphs as if reproduced here.

113.    The Agreement is a valid and binding contract between Meredith and the Licensors.

114.    Meredith has at all times performed under the Agreement.

115.    On February 21, 2025, the Licensors purported to notice Meredith's breach under Section 6(g) the Agreement, and threatened that the failure to cure this breach may result in the termination of the Agreement.

116.    Meredith has not materially breached Section 6(g) of the Agreement, and so there is no basis for the Licensors to unilaterally terminate the Agreement.

117.    This dispute presents an actual controversy between the parties of sufficient immediacy and reality to warrant the issuance of a declaratory judgment in accordance with 28 U.S.C. § 2201(a).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Meredith prays for entry of an Order:

(a)    Declaring that Meredith has not materially breached Section 6(g) of the Agreement and accordingly the Licensors have no basis to unilaterally terminate the Agreement;

(b)    Awarding Meredith its reasonable fees, costs, and expenses in this action, including attorney's fees; and

(c)    Awarding Meredith such other and further relief as the Court finds just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff Meredith hereby demands a jury trial on all issues so triable as of right.

Dated:  March 21, 2025                          Respectfully submitted,


                                                QUINN EMANUEL URQUHART &
                                                SULLIVAN, LLP

                                                By:   /s/ Jennifer J. Barrett

                                                Jennifer J. Barrett
                                                Nicholas A.S. Hoy
                                                295 Fifth Avenue
                                                New York, NY 10016
                                                Telephone: (212) 849-7000

                                                Stacylyn M. Doore (*pro hac vice*
                                                forthcoming)
                                                111 Huntington Avenue, Suite 520
                                                Boston, MA 02199
                                                Telephone: (617) 712-7100

                                                *Attorneys for Plaintiff Meredith Operations*
                                                *Corporation*

24